[File No. 6577.]

FREDERICK VAN CAMP, Mary S. Van Camp, Philana Van Camp and Edith Van Camp, Appellants, v. MARY J. PETERSON and L. R. Baird, as Receiver of the Farmers State Bank of St. Thomas, North Dakota, an Insolvent State Banking Corporation, Respondents.

(286 N. W. 903.)

Opinion filed March 22, 1939.   On Rehearing July 14, 1939.

*DePuy & DePuy,* for appellants.

*Ben Greenberg,* for respondents.

ENGLERT, Dist. J. This is an appeal from a judgment of the district court of Pembina county. The action is one in equity. It was brought to compel specific performance of an alleged oral agreement. The complaint is long and quite involved. Much that is therein alleged is repeated in the testimony of the plaintiffs. In short, they allege that their creditors agreed, during the statutory period of redemption from the mortgage foreclosures hereinafter mentioned, that Frederick Van Camp should make application to the Federal Land Bank of St. Paul for a loan of $12,000 upon all of the land foreclosed upon, and that such $12,000 was "to retire the entire indebtedness of the plaintiffs," and to extend the period of redemption for another year beyond the time allowed by statute. The defendant, L. R. Baird, as Receiver of the Farmers State Bank of St. Thomas, North Dakota, and the defendant, Mary J. Peterson, answered, denying any such agreement and claiming title to the premises foreclosed upon as their interests appear. The other defendants did not answer, and make no claim except that Swan W. Swanson holds a first mortgage upon one of the quarter sections of land to be hereinafter noted. The trial court decided that the plaintiffs had not proven any agreement which the defendants could be compelled to specifically perform. Judgment was entered in favor of the answering defendants, as their respective rights and interests appeared. From this judgment, the plaintiffs appealed to this court. A trial de novo is demanded here.

The facts in this case are somewhat complicated. Frederick Van Camp was the only witness for the plaintiffs. It is rather difficult to state his evidence in narrative form or in a chronological order. Much of the evidence is disconnected, unrelated, and the result of mere conclusions of the witness. The parol testimony, so far as material, can be stated and applied to best advantage in connection with the points to be considered and decided.

The record evidence and matters not in dispute which are essential to an understanding of the controversies between the parties may be stated as follows:

Frederick Van Camp became the title owner, on November 30, 1912, of the Southwest Quarter of Section 16, in Township 159, Range 53, in Pembina county, North Dakota. This quarter section of land will be hereinafter referred to as the southwest quarter.

On November 24, 1914, Frederick Van Camp and wife gave a first mortgage on this southwest quarter to S. E. Peterson, for the sum of $3,000, due November 24, 1919, bearing 7 per cent interest until maturity, and 10 per cent thereafter. S. E. Peterson assigned this mortgage to Mary J. Peterson, his wife, on March 6, 1916. Mary J. Peterson assigned it to the First National Bank of Grand Forks, North Dakota, on June 12, 1926, as collateral security for an unpaid balance of $3,500, owing by S. E. Peterson, her husband, to the said bank. On June 14, 1934, Mary J. Peterson paid the said $3,500, and at her request the First National Bank of Grand Forks assigned it to Swan W. Swanson, on the 14th day of June, 1934, from whom she had borrowed $3,000. This mortgage has not been foreclosed, and the said Swan W. Swanson is now the holder thereof, and it is the first lien against said southwest quarter.

Mary S. Van Camp, wife of Frederick Van Camp, and one of the plaintiffs herein, became the title owner of the Southeast Quarter of Section 17, in Township 159, Range 53, in Pembina county, North Dakota. This quarter section of land will be hereinafter referred to as the southeast quarter. The prior owner of this southeast quarter, one John Van Camp, gave a first mortgage thereon to C. S. Ganssle, on October 1, 1910, for the sum of $2,200, due October 1, 1920, bearing interest at $6\frac{1}{2}$ per cent to date of maturity, and 10 per cent there-

after. On August 26, 1931, C. S. Ganssle assigned this mortgage to L. R. Baird, as Receiver of the Farmers State Bank of St. Thomas, North Dakota. The said Farmers State Bank had gone into receivership on May 19, 1929, and L. R. Baird is the duly appointed, qualified and acting receiver thereof. L. R. Baird, as such receiver, foreclosed the said mortgage, and at the foreclosure sale thereof, on June 4, 1932, he bid the said premises in for the sum of $4,959.04. This was the total amount due on said mortgage and costs of foreclosure, and he received the sheriff's certificate of sale therefor.

Philana Van Camp and Edith Van Camp, sisters of Frederick Van Camp, and the other two plaintiffs herein, became the owners of the Northwest Quarter of Section 16, in Township 159, Range 53, Pembina county, North Dakota, on April 3, 1916. This quarter section will hereinafter be referred to as the northwest quarter.

On March 15, 1923, Philana and Edith Van Camp gave a first mortgage upon this northwest quarter to Mary J. Peterson for the sum of $2,200, bearing interest at 7 per cent until due, March 15, 1928, and 10 per cent thereafter. Mary J. Peterson assigned this mortgage to S. E. Peterson and Stanley Ganssle, on February 21, 1928, and they assigned it to L. R. Baird, as Receiver of the Farmers State Bank of St. Thomas, on April 9, 1931. L. R. Baird, as such receiver, foreclosed this mortgage, and at the sale thereof, on March 19, 1932, he bid the said premises in for the total amount due and costs, in the sum of $3,016.70, and received the sheriff's certificate of sale therefor.

There were no other mortgages against this northwest quarter.

Frederick Van Camp and Mary S. Van Camp, husband and wife, gave a second mortgage, on February 8, 1916, upon the southwest quarter and the southeast quarter, to the Farmers State Bank of St. Thomas, for the sum of $4,500, due December 1, 1917, and bearing interest at 10 per cent. This mortgage was purchased by S. E. Peterson from the said Farmers State Bank on March 25, 1918, and he paid the said bank the sum of $4,650 in cash. The said Farmers State Bank executed an assignment of the said mortgage, and for business reasons no assignee was named in the assignment. In 1923, S. E. Peterson borrowed from the First National Bank of Grand Forks the sum of $5,000, and pledged this mortgage as security, by inserting the name of the said First National Bank in the said assignment. S. E. Peter-

son had reduced the said $5,000 to $3,500 by June 12, 1926, at which time, as already stated, his wife, Mary J. Peterson, guaranteed payment of this balance, and pledged additional security. At the request of the Petersons, the said First National Bank foreclosed the said mortgage on March 26, 1932, and bid the premises in for the total amount due on said mortgage and costs, in the sum of $8,001.68, and received a sheriff's certificate of sale therefor. On June 14, 1934, Mary J. Peterson paid the said First National Bank their indebtedness to the bank in the sum of $3,500, whereupon the said First National Bank assigned the said sheriff's certificate of the said mortgage foreclosure sale to the said Mary J. Peterson, and she is now the holder thereof.

Frederick Van Camp and Mary S. Van Camp, on December 30, 1921, gave a third mortgage on the southwest quarter and the southeast quarter, to the Farmers State Bank of St. Thomas, for the sum of $4,700, bearing interest at 9 per cent, and due October 1, 1922. This mortgage has not been foreclosed, and L. R. Baird, as Receiver of the Farmers State Bank is the holder of said mortgage.

This action was begun on July 21, 1934.

The appellants thus state their first contention, in their brief: "That a parol agreement was made during the normal period of redemption whereby the creditors agreed to accept the proceeds of a Federal Land Bank loan in full settlement of their claims, both secured and unsecured, and after the loan was arranged for and the period of redemption had expired, the respondents breached the agreement and refused to carry it out."

To dispose of this point requires a consideration of the evidence bearing thereon.

Prior to the foreclosure of the said second mortgage on March 26, 1932, by the First National Bank of Grand Forks, J. R. Carley, President of the said bank, endeavored to force payment of the $3,500, due from the Petersons. Being unable to secure payment from the Petersons, he wrote to Frederick Van Camp, and wife, mortgagors of the two mortgages pledged by the Petersons. On January 27, 1932, in response to such letter, Van Camp went to Grand Forks and had a conference with Carley. Carley informed Van Camp that the bank needed money, and unless payments were made the bank would foreclose. They went over the notes and mortgages pledged by the Petersons to deter-

mine how much Van Camp and wife owed thereon. Van Camp testified: ". . . We looked it over together, looked like about $12,000.00. . . . I says, . . . 'I do know this, until I know where my payments are being made and what indorsements are made and further whether it can be squared down to where there is some use of me trying to work out on it, we might as well forget it.' He says, 'What are you going to do?' I says, 'Do whatever you like.' He says that he better go ahead and foreclose. . . . I said, 'You don't need to foreclose this paper; you give me a lease for three or five years . . . and I will give you a deed.' He says, . . . 'Isn't that your home quarter?' I says, 'Yes, for 45 years.' . . . 'I am not going to take it,' he says. . . . He says, 'We will go ahead and foreclose and see what we can do. We will make no promises but we will work out on it the best we can.' I says, 'All right.' I went home. . . . Never heard a word until he called me on the phone and said he made arrangements whereby we could save the whole three quarters, and to come right down. . . . So I went down . . . the latter part of October; we were still working on beets. I took Mrs. Van Camp down. She thought and I thought there might be papers to sign right away. I says, 'What is your big plan now?' He says, 'The Federal Government is starting to make loans again. . . . I have a friend, Mr. Torgerson . . . he will be a friend of yours and an official in the St. Paul bank. . . . We will work together with him to get as good a loan as he can and see what we can do with it. . . . If we get a loan at all you come down and I will see to it that you go home with all your paper and your farm.' . . . I says, 'I don't think we can get a loan, there is snow on the ground.' 'This will go maybe,' he says, 'Anyway . . . go and apply.' . . . 'I need money very badly. You do your best and come down with me and you will see whether you get that farm or not.' It kept snowing and I applied. That is as far as it got."

. . . . . . . . . . . . .

"Q. Did you make application for a loan? A. Yes, I did.

"Q. Was that granted? A. It was snowing at the time I was down and the loan didn't go through."

Van Camp also testified that Carley said: "It means a complete cleanup of everything. I am in a position to do that."

Carley testified that he had gotten the Petersons to agree that he could deal with the Van Camps by compromising their $12,000 debt which they owed to the Petersons for the sum of $6,500. Out of that amount, if paid, the First National Bank was to retain $3,500 in payment of the Petersons' debt to the bank, and the Petersons were to secure $3,000.

It is, of course, perfectly clear that the first conference between Carley and Van Camp related only to the debt that the Petersons owed to the bank, and the amount that Van Camp and wife owed the Petersons, on the two mortgages, pledged as collateral with the bank. It is equally apparent that, at the meeting during the latter part of October, 1932, Carley was primarily interested in having the $3,500, due from the Petersons to the bank, paid. He was not interested in Baird's foreclosures. They were not mentioned. There is no evidence that Baird was mentioned in any way. "If we get a loan at all you come down and I will see to it that you go home with your paper and your farm," meant that Carley would surrender the first and second mortgages on Van Camp's home farm, the southwest quarter. Carley held none of Baird's mortgages or certificates of mortgage foreclosure sales. There is not the slightest bit of testimony that Carley was representing Baird, or that he had any authority to do so.

Great stress is laid by appellants, however, upon what Van Camp claims that Carley said: "It means a complete cleanup of everything. I am in a position to do that." They say, in their brief, "Carley had undoubtedly conferred with Conroy as he knew Baird's interests were such that no deal could be put through without Conroy's co-operation." The all-conclusive answer to this is, that the evidence shows no such conference or arrangement between Carley and Conroy, or that either Baird or Conroy vested Carley with any such authority. Courts cannot decree contracts between parties on mere assumptions. The assumption on the part of appellants is based on pure speculation.

A careful reading of the record convinces us that when Carley said, "It means a complete cleanup of everything," meant a cleanup of what Van Camp and wife owed to the Petersons, and the debt due from the Petersons to the bank. This is apparent from the further statement, "I am in a position to do that." He had authority to compromise their debts, and surrender the notes and mortgages securing the same.

He had no authority to deal with or surrender any securities or sheriff's certificates of mortgage foreclosures held by Baird.

But Van Camp also testified: "Mr. Bain told me the same as Mr. Carley to go ahead and apply for a loan and then make a deal," and that Conroy said: 'I was to apply for a loan and get as good a loan as I could and see how we could work it out then." These statements do not amount to any agreement to extend the right to redeem beyond the time given by the statute. An agreement to extend the period of redemption beyond the time allowed by statute must be establishd "by clear and convincing evidence." Kenmare Hard Coal, Brick & Tile Co. v. Riley, 20 N. D. 182, 126 N. W. 241. Neither do they amount to an agreement that whatever loan might be secured would be acceptable. The Van Camps owed over $25,000, besides several years' taxes. Before Van Camp could secure any loan all their debts had to be paid, compromised or liquidated on some basis. There were secured creditors and unsecured. In what proportion should the loan be shared? Then, too, some had better security than others. Courts cannot compel specific performance of such incomplete agreements. Those statements amount to just what they say—apply for a loan and then make a deal.

The First National Bank closed on March 5, 1933. W. V. O'Connor was appointed receiver.

Frederick Van Camp rented the southeast quarter from Baird for the year 1933, and he has been Baird's tenant up to the commencement of this action. Joe Van Camp leased the northwest quarter from Baird for the year 1933, and he has been a tenant of Baird's since that time.

In the fall of 1933, Frederick Van Camp, of his own volition, made application for a loan on the three quarters of land and his personal property to the Federal Land Bank of St. Paul. On January 5, 1934, the said bank sent a commitment to Van Camp that it would make a loan for $12,000. This commitment required that all debts be paid. It also required notice of acceptance within thirty days from the date thereof. On January 23, 1934, Van Camp wired Conroy to meet him at the First National Bank in Grand Forks. The Van Camps' creditors met there on January 25, 1934. They discussed the question of reaching a composition of debts, and how the creditors should share the $12,000 loan.

Van Camp testified, "He (Conroy) says none of us can do business and that was self-evident."

"Q. And you did no business? A. No, sir. . . .

"Q. Wasn't all this talk and especially the talk of Conroy all tentative? A. Yes, sir, to quite an extent, yes.

"Q. Never no definite understanding? A. Not a final agreement, no."

Van Camp also stated that while they were figuring and discussing the figures "Mrs. Peterson came in and it all broke up. Mr. Conroy did not say he would take it or would not take it."

From this evidence only one conclusion can be reached, and that is, that the creditors did not come to any agreement. No court would be justified in compelling specific performance of such loose talk, incomplete and indefinite agreements. In what proportion could the court compel the creditors to accept the $12,000 prospective loans. Courts cannot make contracts for parties. They enforce contracts made. That no contract had been made is apparent from Van Camp's own testimony.

"Q. Now, Mr. Van Camp, getting back to the negotiations looking for this settlement and particularly the two meetings at the First National Bank at the time the negotiations were started, you didn't know whether anything could be done, did you? A. Whether the parties would agree?

"Q. Yes. A. No, I didn't know.

"Q. You had this commitment that has been introduced in evidence as Exhibit 'A,' this twelve thousand dollar commitment? A. Yes.

"Q. Your idea was to take this commitment, take it to these people at Grand Forks, have Mr. Conroy present and to have particularly that talk and talk things over to see if with this commitment you could save or repurchase this land? A. Yes, sir."

The appellants also claim that Carley had agreed with Frederick Van Camp to accept $3,500, due from the Petersons to the First National Bank, and to satisfy and surrender the two mortgages pledged. This contention is based upon the facts already related and what took place at the conferences between them on January 27, 1932, and the latter part of October, 1932, and hereinbefore discussed and considered. This argument does not warrant serious consideration. It ought to be

enough to say that Van Camp did not have $3,500 with which to pay the Peterson debt, and he had no way of getting it unless he could borrow on the land owned by Baird, as receiver.

It is also argued that the unqualified assignments of the two mortgages pledged as collateral divested the Petersons of all right, title or claim therein. There is no merit in this contention. Sprenger v. First State Bank, 53 N. D. 398, 206 N. W. 224; Aulwes v. Farmers State Bank, 44 S. D. 92, 182 N. W. 528.

The Van Camps were not in a position to question that pledge. That was a matter between the bank and the Petersons.

Besides, whatever Van Camp's talk with Carley was, his application for a loan failed. The First National Bank closed on March 5, 1933. W. V. O'Connor was appointed receiver. In June, 1933, Van Camp talked with O'Connor, and wanted him to foreclose on the first mortgage held by the bank as collateral, so that he could deal with O'Connor.

"Q. And you (Van Camp) left it go at that? A. Yes, sir."

It is also argued that the foreclosure of the second mortgage by the First National Bank of Grand Forks is void because it bid the two quarters in en masse. By this action, the plaintiffs seek to redeem. When a mortgagor proceeds upon the theory that the foreclosure proceedings are legal and valid, he waives such irregularities. On redeeming or seeking to redeem he does so assume. The remedies for attacking the sale and to redeem are wholly inconsistent. When this action was begun, July 21, 1934, no mention or complaint is made of any irregularity in the foreclosure proceedings. The plaintiffs did not question the foreclosure until January 31, 1935. This comes too late. Power v. Larabee, 3 N. D. 502, 57 N. W. 789, 44 Am. St. Rep. 577.

In that case, the court said: "After a party has chosen his remedy, has pursued it persistently and has manifested no purpose to attack the sale until time for redemption has expired, he cannot, at that late day, change front, and question the validity of the sale he has repeatedly, and for a long time, recognized and affirmed." Michael v. Grady, 52 N. D. 740, 204 N. W. 182; Green v. Newberry, 55 N. D. 783, 215 N. W. 273.

A careful review and consideration of the evidence in this case leads

us to the conclusion that the judgment of the trial court should be affirmed, with costs. It will be so ordered.

NUESSLE, Ch. J., and MORRIS, CHRISTIANSON, and BURR, JJ., concur.

ENGLERT, Dist. J. (On rehearing.) On petition of the plaintiffs a rehearing was ordered herein, and the case was resubmitted on written briefs, and after carefully re-examining the same, we are agreed that the opinion heretofore handed down should stand.

NUESSLE, Ch. J., and CHRISTIANSON, MORRIS, and BURR, JJ., concur.